UNITED STATES DISTRICT COURT
FOR THE WESTERN OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| BRENDA TRACY, LLC; SET THE EXPECTATION, A NON-PROFIT ORGANIZATION; JANE DOE 1; JANE DOE 2; JANE DOES YET TO BE IDENTIFIED, <br><br> Plaintiffs, <br><br> v. <br><br> AGUSTIN ALVARADO; MEL TUCKER; JENNIFER Z. BELVEAL; FOLEY & LARDNER LLP; JOHN DOE(S) AND JANE DOE(S) IN POSSESSION OF RECORDS WHOSE NAMES ARE KNOWN ONLY TO DEFENDANTS, <br><br> Defendants. | Case No.: 23-cv-01102 <br><br> **ORAL ARGUMENT REQUESTED** <br><br> **EXPEDITED CONSIDERATION REQUESTED** |

## DEFENDANTS' EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER

Defendants, through their undersigned counsel, hereby move the Court for an emergency hearing to dissolve the *ex parte* Temporary Restraining Order entered by the state court on October 6, 2023, which otherwise expires October 20, 2023 (*see* Ex. A to Defendants' Notice of Removal).  In support of this motion, Defendants submit the brief and affidavits filed contemporaneously herewith.

Respectfully submitted: October 17, 2023

/s/John F. Birmingham
John F. Birmingham (P47150)
Jennifer L. Belveal (P54740)
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100
jbirmingham@foley.com
jbelveal@foley.com

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE WESTERN OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| BRENDA TRACY, LLC; SET THE EXPECTATION, A NON-PROFIT ORGANIZATION; JANE DOE 1; JANE DOE 2; JANE DOES YET TO BE IDENTIFIED,<br><br>      Plaintiffs,<br><br>    v.<br><br>AGUSTIN ALVARADO; MEL TUCKER; JENNIFER Z. BELVEAL; FOLEY & LARDNER LLP; JOHN DOE(S) AND JANE DOE(S) IN POSSESSION OF RECORDS WHOSE NAMES ARE KNOWN ONLY TO DEFENDANTS,<br><br>      Defendants. | Case No.: 23-cv-01102<br><br>**EXPEDITED CONSIDERATION REQUESTED**<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

i

Eric D. Delaporte (P69673)
Gina Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
210 State St., Suite B
Mason, MI 48854
*Attorneys for Plaintiff*

John F. Birmingham (P47150)
Jennifer L. Belveal (P54740)
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100
jbirmingham@foley.com
jbelveal@foley.com

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................1

II.   STATEMENT OF RELEVANT FACTS.........................................................4

   A. The Underlying RVSM Investigation ................................................... 4

   B. Plaintiffs Created a "Red Herring" to Suggest This Case Involve
      Confidential Business or Medical Information. ............................... 13

III.   ARGUMENT...................................................................................................16

   A. Plaintiffs Seek Extraordinary Relief Not Remotely Justified Here. ............. 16

   B. Plaintiffs Dirtied Their Hands with Lies, Barring Injunctive Relief. ........... 17

   C. Plaintiffs Have No Expectation of Privacy in Tracy's Communications on
      the Phone; on the Contrary, Defendants Have a First Amendment Right to
      Release Relevant Communications. .................................................... 20

   D. Plaintiffs Cannot Succeed on the Merits of Their Frivolous Claims. .......... 23

   E. Other Factors Weigh Against Plaintiffs' Desired Injunctive Relief Here. . 33

IV.   CONCLUSION ..............................................................................................35

## I.   __INTRODUCTION__

In persuading the state court that an emergency *ex parte* temporary restraining order ("TRO") was necessary, Plaintiffs presented a house of cards founded on utter fabrications, leaving them with the uncleanest of hands in seeking such extraordinary relief.  Having secured a state court TRO on false pretenses, Plaintiffs first amended their complaint ("Am. Compl.") to drop their most frivolous claims, including one that formed the supposed exigent circumstances for emergency relief, baselessly alleging that Defendants threatened to release sexual assault survivors' mental health records in violation of state law: an absolute untruth.   Then, when Defendants removed the case to federal court, Plaintiffs requested to drop yet another claim, the Computer Fraud and Abuse Act Count, that they relied upon to obtain the *ex parte* TRO.  This bait-and-switch is telling but ultimately futile; Plaintiffs have no valid claims, then or now.  Hence, there is no basis to continue the temporary restraining order[1] or to enter any preliminary injunction.

It is best to begin by examining what this case is *not* about because Plaintiffs' moving papers are misleading.  This case is *not* about safeguarding legally protected business records or medical information.  This case is *not* about a "stolen" cell phone on which those records allegedly exist.  Instead, after Brenda Tracy deleted text messages, provided the investigator with her cherry-picked incomplete statements,

---

[1] The temporary restraining order will expire by its terms on October 20, 2023.

and then released these statements and the entire investigative report to the national media, Plaintiffs seek to suppress Tracy's own additional statements that are relevant to the bogus sexual harassment complaint she filed against Defendant Mel Tucker ("Tucker") with Michigan State University ("MSU" or "the University"), and to MSU's resultant bogus investigation into her personal relationship with him.

Tracy, the founder of Plaintiff Brenda Tracy, LLC ("BTLLC") and Plaintiff Set the Expectations ("STE"), has plotted to take down Tucker for over a year. She recently thrust her false accusations into national spotlight by releasing MSU's entire 1200-page confidential investigation file to USA Today, including select excerpts of her own written communications with a key witness, her deceased friend Ahlan Alvarado ("Ahlan"), in violation of MSU's process that she invoked. That media ploy prompted MSU to wrongfully terminate Tucker's contract and irreparably harmed his career and reputation.

Forced to defend himself, Tucker's legal team informed the MSU Board of Trustees that Tracy manipulated Tucker, Ahlan, the University, and the public. To demonstrate this, Defendant Attorney Jennifer Belveal ("Attorney Belveal") sent a letter to the MSU Board of Trustees, citing additional portions of Tracy's written communications with Ahlan that contradicted and/or contextualized the statements Tracy had misleadingly offered to MSU and the public via USA Today. Communications like Tracy's statement that "Tucker told me he loved me." Or that

2

"money is my only recourse to make [Tucker] feel like there is a punishment."  It is *those* communications, which Defendants heavily redacted—not legally protected confidential business or medical information—at the heart of Plaintiffs' Motion for Emergency TRO and/or Preliminary Injunction ("Motion").

Tracy tried to secure this damning evidence from disclosure months ago, repeatedly attempting to obtain the phone Ahlan had been using ("the Phone") as Ahlan lay dying in her hospital bed and even after she died.  In fact, Tracy sought to get the Phone from its lawful owner, Defendant Agustin Alvarado ("Agustin"), Ahlan's husband—yet now makes the sanctionable allegation that Agustin "stole" the Phone he owns.  Having failed then to cover her tracks, Tracy misled  the state court—securing an *ex parte* TRO based on layers of lies.  The lie that these communications are "legally protected" confidential business or medical information.  The lie that Attorney Belveal, who has an impeccable reputation earned over 27 years of practice and who is an officer of this court, "has released and threatened to continue publishing . . . sensitive, private, legally-protected information related to [Plaintiff business entities] and its clients/associates" and "otherwise terrorize[d] [third party sexual assault] survivors and intimidate[d] them." And again, the lie that Agustin "stole" the Phone.  All to cover up Tracy's original lie to MSU and to the public that Tucker sexually harassed her.

The truth is that Tracy leveraged incomplete and self-serving portions of her written communications with Ahlan to ruin Tucker in the court of public opinion, but now hides behind her business entities, the "Plaintiffs," to claim it was unlawful for Defendants to release portions of those same communications to defend the life she destroyed.  Make no mistake:  Defendants lawfully obtained materials from the Phone.  Defendants then released additional communications between Tracy and Ahlan pertaining to a matter *Tracy* put in the public eye.  These materials *never referred to nor suggested the existence of* any legally protected business or medical information.  Defendants did not release or threaten to release such information and they never would.

For these reasons, detailed below, this Court should immediately dissolve the *ex parte* temporary restraining order and deny Plaintiffs' request for a preliminary injunction.

## II.    STATEMENT OF RELEVANT FACTS

### A. The Underlying RVSM Investigation

#### 1.  Tracy Falsely Accused Tucker of Sexual Harassment.

Tracy filed a complaint with MSU in December 2022, falsely accusing Tucker of violating the University's Relationship Violence and Sexual Misconduct Policy

(the "RVSM Complaint").[2]   These false accusations launched a baseless investigation into Tucker's private life.   Tracy released the entire 1200-page investigation file to USA Today, which included some of Tracy's written communications with Ahlan that Tracy had self-selected.  In turn, MSU terminated Tucker's employment.[3]   Tracy's false accusations irreparably damaged Tucker's career, reputation, well-being, and livelihood.   Her self-selected written communications with Ahlan were central to MSU's investigation and thus to Tucker's ability to defend himself both in that investigation and in responding to MSU's termination notice.

It is against this backdrop that, after heavy and meticulous redactions, Attorney Belveal informed MSU's Board of Trustees of certain relevant written communications between Tracy and Ahlan.  ***None*** of those communications contain confidential business or medical information or reference to other assault victims.[4]

---

[2] *See* Kenny Jacoby, *Michigan State Football Coach Mel Tucker Accused Of Sexually Harassing Rape Survivor*, USA TODAY (Sept. 10, 2023), https://www.usatoday.com/story/news/investigations/2023/09/10/michigan-state-football-coach-sexual-harassment-claim/70679703007/

[3] *Id.*; *MSU Athletic Director Terminates Mel Tucker, Office for Civil Rights Case Continues*, MICH. STATE UNIV. (Sept. 27, 2023), https://msu.edu/issues-statements/2023-09-27-haller-statement-on-termination-of-tucker.

[4] *See* Ex. B to Plaintiffs' Brief ("Pl. Br."), Attorney Belveal's October 5, 2023 Letter to the MSU Board of Trustees (hereafter "the Letter").

Attorney Belveal did not provide her letter to the Lansing State Journal referenced in the Amended Complaint, nor did she release it to the mass media.[5]

### 2. Tracy Misled MSU and the Public by Providing Select Excerpts of Her Communications with Ahlan that She Now Claims Are Private.

BTLLC hired an LLC partly owned by Agustin for part-time work.[6] It was through Agustin's LLC, that Ahlan worked as a "booking assistant"[7] for BTLLC; there is no evidence that Ahlan had an employment relationship with Tracy personally. Ahlan was also allegedly Tracy's "closest friend."[8] Ahlan passed away in June 2023.[9] Tracy offered Ahlan as a key witness in the RVSM investigation, and, after deleting most of her relevant text messages with Tucker, Tracy provided self-serving excerpts of her written communications with Ahlan to the investigator. For example, Tracy offered a screenshot of the following exchange with Ahlan, to insinuate some ulterior motive on Tucker's part with respect to Tracy's attendance at MSU's spring football game as an "honorary captain" and that she was not happy with the situation:

> **Ms. Tracy**: I saw an interview with Tucker about the practice and he said "Brenda Tracy was in town and educating our players is important" or something similar

---

[5] Exhibit 1, Affidavit of Jennifer Belveal ("Belveal Aff.") ¶ 12.

[6] Exhibit 2, Affidavit of Agustin Alvarado ("Agustin Aff.") ¶ 5.

[7] *See* Ahlan's LinkedIn profile, available at *https://www.linkedin.com/in/ahlan-alvarado-4a6686140/*.

[8] *See* Ex. C to Pl. Br., Affidavit of Brenda Tracy ("Tracy Aff."), ¶ 3.

[9] Am. Compl. ¶ 15.

but not she's serving as captain. Or we're wearing shirts to raise awareness or even a mention of set the expectation. I wonder if it's bc of the behind the scenes stuff that he's now being weird[.] Like he's nervous to talk about me now? "She's in town" what??

\* \* \*

**Ms. Alvarado:** They took care of us but the important part was to raise awareness

**Ms. Tracy:** Exactly. It's not about you and me

**Ms. Alvarado:** It's always about them somehow

**Ms. Tracy:** I gotta step all the way away. I can't have this messing with the message or mission[.] That's not something I can do[10]

However, Tracy purposefully omitted her further communication to Ahlan— just two hours later—affirming that, actually, once MSU posted about her on social media and she had a possible marketing opportunity with MSU, everything was "good."  Specifically, she excluded her statement to Ahlan that:

> **MSU posted and Coach isn't being weird at all. Feels like all is good[.] And I all of a sudden have a tshirt discussion with licensing at MSU and some non athletic staff and a T-shirt company[.] Blessings on blessings when you stay the course and do what's right. . . . No regrets. My heart is good and so is my conscience[.][11]**

In other words, Tracy hid the true nature of her sentiment toward Tucker following the spring game to try to convince the University that she had a legitimate

---

[10] *See* Ex. B to Pl. Br., the Letter pp. 4-5.
[11] *See* Ex. B to Pl. Br., the Letter pp. 4-5.

harassment claim.  She did so by providing partial excerpts of the very written communications with Ahlan that she now claims are private.  Tracy did not keep these incomplete and misleading written communications solely to the investigator, either.  She sent them to USA Today.  By late June 2023, Tracy had given USA Today exclusive access to her story about her allegations against Tucker, ultimately providing the entire 1200-page confidential investigation file in violation of MSU policy, including copies of certain written communications she had with Ahlan.  Then, *allegedly* upon learning that someone at MSU leaked her name to the press, Tracy authorized USA Today to publish her side of the story.[12]  Now she's abusing judicial resources—claiming that *only she* decides what is truthful and relevant—in a radical effort to keep Tucker's side silent.

### 3. The University Wrongfully Terminated Tucker's Contract Based on Tracy's Lies.

Although MSU knew about Tracy's allegations and Tucker's response to them for nearly half a year before Tracy went public, MSU terminated his contract

---

[12] *See* Kenny Jacoby, *Mel Tucker Made Millions While He Delayed the Michigan State Sexual Harassment Case*, USA TODAY (Sept. 14, 2023), https://www.usatoday.com/story/news/investigations/2023/09/14/mel-tucker-paid-amid-sexual-harassment-inquiry-stall-michigan-state/70856165007/. Tracy has not explained how providing the entire confidential file to a national media outlet is somehow proportionate or responsive to the alleged leak of her name. In any event, *Tracy herself* is responsible for public dissemination of written communications between she and Ahlan.  For her to claim Defendants' release of related, surrounding communications was illegal smacks of hypocrisy.

almost immediately after USA Today ran an exclusive story from Tracy detailing her allegations and the MSU proceeding.[13]  Tucker's representatives publicly disavowed Tracy's allegations and MSU's termination decision.[14]  Upon seeing one of these press releases, Agustin, through his legal counsel, contacted Attorney Belveal.[15]  Agustin reached out because he was concerned that, based on what he knew about Tracy's character and her desperate attempts to access the Phone,[16] Ahlan may have unknowingly been a conduit to fraud or defamation vis-à-vis Tucker.[17]  Agustin suspected the Phone may contain evidence of fraudulent activity,

---

[13] *See* MSU press release cited in footnote 3.

[14] *See, e.g.*, Matthew Lounsberry, *Mel Tucker Releases Statement After MSU Serves Termination Notice* (Sept. 19, 2023), https://www.si.com/college/michiganstate/football/michigan-state-spartans-football-mel-tucker-statement-responds-notice-of-termination-msu-091923.

[15] Agustin Aff. ¶¶ 14-15.

[16] Agustin owns the Phone.  Agustin Aff. ¶ 6.  *See also* Arizona Statute § 14-2102 part 1. Ahlan and Agustin shared each other's passwords and access to each other's phones, so Agustin knew the password to the Phone, and had had free access to the information on it.  Agustin Aff. ¶ 4.

[17] Agustin Aff. ¶ 14. Tucker's press release also prompted Agustin to inquire of other family members if they were concerned about Tracy's desperate attempts to obtain Ahlan's phone. *Id.* ¶ 10.  One such family member had startling information in this regard, sharing Agustin's opinion that Tracy's behavior as Ahlan was dying was problematic and believing Tracy's allegation of non-consensual phone sex against Tucker was untrue.  Exhibit 3, Affidavit of Jennifer Ruiz, ¶¶ 7-9, 11-15.

and provided the written communications between Ahlan and Tracy to Tucker's

defense team through a third-party forensic specialist.[18]

> ### 4. The October 5, 2023 Letter Responded to Tracy's False Statements Using Other Portions of Her Communications with Ahlan.

Agustin's concern was correct: Tracy's full written communications with

Ahlan painted a radically different picture than the one Tracy led the investigator to

believe.  Attorney Belveal highlighted some of Tracy's inconsistencies in the Letter.

For example:

| Tracy's Representation to Investigator | Tracy's Communication with Ahlan |
|---|---|
| Tracy told the investigator that she told Tucker that she was "single on purpose" and that she does "not date people in [her] field."  In addition, Tracy's lawyer vouched for her on the record, claiming that "in all her years of knowing [Tracy], she had never known [her] to date or otherwise become romantically involved with anyone with whom [she] had a professional relationship." | In fact, Tracy's communications to Ahlan indicated that she had a dating relationship with another college coach, Damon Stoudamire, in the same timeframe that she carried on a deeply personal relationship with Tucker. Tracy also appears to have had a professional relationship with that coach and his employer. |
| Tracy told the investigator that she would not have accepted gifts from Tucker after she knew he was romantically interested in her. | In fact, Tracy's communications to Ahlan indicated that, after knowing Tucker was romantically interested in her, she planned to seek bowl game tickets and money to finance STE's marketing materials from him. |
| Tracy told the investigator that she "has not mentioned money a single time in connection with [this matter]." | In fact, Tracy's communications to Ahlan indicated that she repeatedly mentioned getting money from Tucker, |

---

[18] Agustin Aff. ¶¶ 14-15; Exhibit 5, Affidavit of Brandon Fannon ("Fannon Aff.") ¶¶ 4-6.

| Tracy's Representation to Investigator | Tracy's Communication with Ahlan |
|---|---|
|  | "a $95M coach" in connection with her RVSM Complaint against him. |
| Tracy made repeated claims to the media that someone had leaked her name to the media, forcing her to go public with the entire 1200-page investigation report before the process had concluded.[19] This resulted in a leak investigation by MSU.[20] | Tracy's communications with Ahlan actually show that Tracy shared information with multiple members of the media in an attempt to shape the narrative several months in advance of the investigation's completion. Specifically—in addition to telling various individuals affiliated with her organization about the investigation— Ms. Tracy discussed the investigation with two different ESPN reporters in March and May 2023, respectively, before reaching an exclusive deal with USA Today in June 2023. |

In short, the written communications between Tracy and Ahlan cited in the Letter fall into three buckets: (1) Tracy's personal relationships with Tucker and another coach; (2) Tracy's discussions with ESPN and USA Today regarding her

---

[19] In a **draft** press release referenced by The State News on September 27, 2023, Ms. Tracy's lawyer claimed that "[s]omeone associated **with the MSU Board of Trustees** disclosed [Ms. Tracy's] identity to an outside party," and "[t]hat outside party shared her identity with local media." *See* Alex Walters, *Brenda Tracy said leak came from MSU boardroom,* THE STATE NEWS (Sept. 27, 2023), *https://statenews.com/article/2023/09/tucker-accuser-said-leak-came-from-msu-boardroom.* A final version of that press release was not as specific but clearly blamed someone other than Tracy for the leak. *Id.*

[20] *See MSU confirms investigation into potential breaches of confidentiality in ongoing Office for Civil Rights case*, MICH. STATE UNIV. (Sept. 18, 2023) https://msu.edu/issues-statements/2023-09-18-statement-on-investigation-into-confidentiality-compromise#:~:text=Michigan%20State%20University%20has%20contracted,12.

allegations against Tucker; and (3) Tracy's financial motivations behind her RVSM Complaint.[21]  These buckets in turn relate to Tracy's false accusations against Tucker which she published to the world, including portions of her written communications with Ahlan, through USA Today.

To be sure, the Letter made **_no_** reference to releasing—now or **_ever_**—any "sensitive, private, legally-protected information regarding the business [of STE], individuals associated with the business, its clients, and victims of violence and sexual assault/harassment."[22]  In fact, as apparent in the Letter, the vast majority of Ahlan and Tracy's communications were redacted.  That's not because they contained confidential business or medical information; they did not.[23]  Rather, phone numbers and any portion of the communications not used to highlight Tracy's false or misleading allegations were redacted.[24]  Defendants' redaction of extraneous but benign information undermines Plaintiffs' fake distress that Defendants released or might release protected information.

---

[21] *See* Ex. B. to Pl. Br.

[22] *Compare id. with* Am. Compl. ¶ 24.

[23] Exhibit , Affidavit of Katelynn Williams ("Williams Aff.") ¶ 11.

[24] Williams Aff. ¶ 11.

### B. Plaintiffs Created a "Red Herring" to Suggest This Case Involves Confidential Business or Medical Information.

#### 1. Plaintiffs Mischaracterize STE and Ahlan's Role with STE.

Plaintiffs' Motion implies that STE runs some kind of mental health counseling operation with Tracy as a licensed therapist and Ahlan as "Case Manager."[25]  False.  In fact, Tracy and STE do not hold themselves out as "engaging survivors to resources and mental health assistance."[26]  Tracy is a public speaker, not a therapist.  And as noted, Ahlan was Tracy's part-time "booking assistant." *Supra* p. 6.  Plaintiffs seek to rebrand STE after-the-fact to conjure a fictional, non-existent "threat" that Defendants will release legally protected business or medical information, which, as detailed below, they have never even seen.  Indeed, *after* Plaintiffs got a state court to enter an *ex parte* TRO, they dismissed their claim related to some sort of confidential mental health records and now seek to dismiss

---

[25] Pl. Br. 2.

[26] *Compare* Pl. Br. 3 *with Our Story*, SET THE EXPECTATION, https://www.settheexpectation.org/about-ste/our-story (last visited Oct. 12, 2023), *and About*, BRENDA TRACY, https://brendatracy.com/#about (last visited Oct. 12, 2023).

the CFAA claim.

### 2. There Is *No* Evidence that Defendants Possessed, Reviewed, Released, or Plan to Release Legally Protected Information.

Neither Attorney Belveal nor any other Defendant has *ever* threatened to release records containing confidential business, medical, or other legally protected information.  Tellingly, Plaintiffs offer no quotation, no citation, no evidentiary support whatsoever for this alleged "threat."[27]  Also telling, Plaintiffs point to *no* actual protected information even *on* the Phone—none.  Take a close look at Tracy's affidavit on this point.   She says the Phone contains "sensitive survivor information."[28]   ***Defendants have neither seen nor reviewed "sensitive survivor information," much less threatened to release it.***[29]  Tracy also claims the Phone contains her "business records, calendar, college and university information, and other business-related information."[30]   Setting aside that she cites no legal protections applicable to this vague catch-all and does not even herself claim it is "confidential," Defendants have not released or threatened to release any of this information, either.[31]  To the contrary, the Letter enclosed *only* heavily redacted

---

[27] Pl. Br. 3.

[28] Tracy Aff. ¶ 9.

[29] Belveal Aff. ¶ 8; Williams Aff. ¶ 7; Ex. B to Pl. Br. Indeed, counsel for Tucker on the pending MSU matter used tailored search terms and dates to identify written communications that may be relevant.  Williams Aff. ¶ 10.  *See also* Fannon Aff. ¶¶ 4-6.

[30] Tracy Aff. ¶ 9.

[31] *See* Ex. B to Pl. Br.; Belveal Aff. ¶¶ 9-10.

written communications limited to particular issues that Tracy herself raised, demonstrating the utmost care in not releasing any extraneous information. Plaintiffs manufactured a false narrative to feign entitlement to injunctive relief and then dismissed the legal claims she used to support the extraordinary request.

### 3.   Defendant Agustin Did Not "Steal" Anything.

Plaintiffs also stoop to the depths of falsely accusing Agustin of theft.  They allege "upon information and belief" that "the unlawfully released records belong to Plaintiffs and the phone upon which they resided belong to the estate of [Ahlan] (for the benefit of her two minor children), and both were stolen by [Augustin]."[32]  Yet another falsehood.  Plaintiffs cannot own "records" that Tracy sent to Ahlan.  *See infra* p. 20.  Moreover, Agustin owns the Phone, and partly owns the business involved in the communications, and Ahlan provided him the password to the phone.[33]  Tracy *knows* the Phone belongs to Agustin:  she tried to get it from him whilst Ahlan lay dying in the hospital and after she died.[34]  Tracy's purported rationale for seeking the Phone at that insensitive time—she wanted "tax information"—conspicuously lacks any concern that the Phone contained legally

---

[32] Am. Compl. ¶ 25.

[33] *See supra* fn. 16.  At the time of Ahlan's death, Agustin and Ahlan were married, although amicably separated, and working collaboratively to support their minor children.  Agustin Aff. ¶ 3.

[34] Agustin Aff. ¶¶ 8-9; *see also* Ex. B to Pl. Br., p. 4.

protected business or medical information.  (Nor do her pleadings in this matter refer to "tax" records.)

Thus, Plaintiffs' Motion marks Tracy's *second* desperate attempt to control which portions of her communications with Ahlan that MSU, Tucker, and the public can see.  She failed to assure her cover-up upon Ahlan's death, so she rushed to the state courthouse to silence the truth and to hide evidence that she led the MSU investigator to believe did not exist.

## III.  <u>ARGUMENT</u>

This Court has the "authority to dissolve or modify injunctions, orders, and all other proceedings had in state court prior to removal*." Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 437 (1974); *see also* 28 U.S.C. § 1450.  For the reasons detailed below, this Court should exercise its authority to dissolve the TRO, and deny Plaintiffs' requested injunctive relief.

### A. Plaintiffs Seek Extraordinary Relief Not Remotely Justified Here.

"To obtain the extraordinary remedy of a TRO, Plaintiffs must 'clearly show that immediate and irreparable injury, loss, or damage will result . . . before [Defendants] can be heard in opposition.'" *Davis v. Wayne Cty. Bd. of Canvassers*, No. 20-12127, 2020 U.S. Dist. LEXIS 147708, at *2-3 (E.D. Mich. Aug. 17, 2020) (citing Fed. R. Civ. P. 65(b)(1)(A)).  "The court considers four factors in determining

whether to issue a TRO: '(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay.'"  *Id.* (citing *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008)).  These same factors are considered in determining whether to grant a preliminary injunction. *Brunner*, 543 F.3d at 361.  In addition, the Court must keep in mind that "the purpose of a preliminary injunction is to preserve the status quo until a trial on the merits*." S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017).

Plaintiffs' burden is a heavy one.  "As the Sixth Circuit has observed more than once, 'preliminary injunctions are 'extraordinary and drastic remed[ies] ... never awarded as of right.'"  *Cavalier Distrib. Co. v. Lime Ventures, Inc.*, No. 1:22-cv-121, 2023 U.S. Dist. LEXIS 38420, at *6-8 (S.D. Ohio Mar. 7, 2023) (citing Sixth Circuit precedent).  Here, Plaintiffs come nowhere close to satisfying their burden.

**B. Plaintiffs Dirtied Their Hands with Lies, Barring Injunctive Relief.**

Plaintiffs' claims are each fatally flawed.  *See* Section III.D.  However, the Court should not lose sight of the fundamental falsehood on which Plaintiffs' TRO

request hinged: that Defendants threatened to "further publish" "solen" confidential business or protected medical information.  *Supra* p. 18.  This is false.[35]

Specifically, Plaintiffs' Motion is premised on the false statement that the "records that Attorney Belveal has threatened to release are records believed to be related to Plaintiffs, and are believed to contain sensitive, private, legally-protected information regarding the business, individuals associated with the business, its clients, and victims of violence and sexual assault/harassment."  Pl. Br. 3; *see also* Am. Compl. ¶¶ 18, 19, 20, 26, 31, 32, 33, 24, 37, 46, 53, 60, 61, 75, 77, 78, 79, 81, 82 (invoking variations on the phrase confidential, sensitive, personal, private, and legally protected, always without citation to or description of any actual records released or on the Phone).  There is no such threat.  Period.  It does not exist. ***Plaintiffs made it up***.[36]  In addition, Plaintiffs lied about the nature of Tracy's communications with Ahlan, about the nature of Ahlan's position with STE, and about the Phone being stolen.  The legal implications of these lies is three-fold.

---

[35] Plaintiffs never contacted Defendants with any concern about confidential business information or medical records. Had they done so, Defendants would have readily addressed any such concerns..

[36] This means Paragraph 26 of the Amended Complaint—which alleges that "the records Defendants Belveal [and] Foley & Lardner LLP have released and threatened to continue publishing records related to BTLLC and STE and its clients/associates, and are believed to contain sensitive, private, legally-protected information regarding the business and its clients"—is sanctionable.

One, injunctive relief is not necessary to maintain the status quo, *i.e.*, "the last actual, peaceable, uncontested status which preceded the pending controversy." *Buck*, 272 Mich. App. at 98 n.4.  It is beyond dispute that the "status" preceding Plaintiffs' Complaint was that Defendants had never released nor threatened to release confidential business or medical information.

Two, Plaintiffs feigned an "irreparable harm" to support injunctive relief.  At bottom, Plaintiffs beg the Court to believe that Defendants' targeted release of Tracy's communications with Ahlan about Tucker, her relationship with another college coach, her leaks of information to ESPN and USA Today, and her personal financial motivations behind her RVSM Complaint hint at some evil, unspoken plan to release confidential business or medical information.  That Plaintiffs prey on sexual assault survivors' legitimate (but irrelevant here) privacy concerns to give drama to this argument is repugnant.  While the communications referenced in the Letter may harm Tracy's case against Tucker, *that* harm does not entitle Plaintiffs to conceal the truth; that's why impeachment, party admissions, and declarations against interest are admissible evidence.  Again, Plaintiffs have dropped their claim relating to the exigent circumstances that might exist if mental health records of sexual assault survivors were involved, essentially admitting that they obtained the *ex parte* TRO based on false allegations and in bad faith.

19

Three, Plaintiffs' "unclean hands" preclude them from obtaining injunctive relief by "closing the doors of [the] court of equity." *Citistaff, Inc. v. Banfield*, 2015 Mich. Cir. LEXIS 286, \*3 (citing *McFerren v. B&B Inv. Grp.*, 253 Mich App 517 (2003); *see also Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1383 (6th Cir. 1995) ("The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party"). The above-detailed falsehoods taint Plaintiffs' case with bad faith related to this matter. Because Plaintiffs' Motion is premised on falsehoods, the Court should dissolve the TRO, decline to issue injunctive relief and award Defendants their attorneys' fees and costs incurred by virtue of Plaintiffs' false statements to the judiciary.

### C. Plaintiffs Have No Expectation of Privacy in Tracy's Communications on the Phone; on the Contrary, Defendants Have a First Amendment Right to Release Relevant Communications.

One more overarching false pretense bears correction at the outset. Plaintiffs' case largely hinges on the pretense that *they* are entitled to keep hidden *Tracy's* written communications to *Ahlan* relating to a matter that *Tracy* shared with *USA Today, including self-selected portions of those written communications.* That is wrong as a matter of law. Once Tracy sent her communications to Ahlan, *i.e.*, to a phone over which Tracy lacks ownership, possession, or control, she relinquished

20

any expectation of privacy with respect to them.  *See People v. Katzman*, 946 N.W.2d 807 (Mich. Ct. App. 2019), *vac. in part on other grounds*, 505 Mich. 1053 (emphasis added) ("***[o]nce defendant sent the initial text message to [another's] cell phone, he no longer had an expectation of privacy in the text-message exchange***"); *see also, e.g.*, *Jones v. Lacey*, 108 F. Supp. 3d 573, 585 (E.D. Mich. 2015) (citing case in which plaintiff's disclosure of "private" information, a positive drug test, to coworkers "eliminate[d] any expectation to a right of privacy and is a waiver to a right of privacy" and holding that an employee who had disclosed her HIV status publicly could not state an informational privacy claim against defendant who also released that information).  Given this authority, Plaintiffs' allegations that the communications on the Phone somehow "belong" to them are entirely implausible.  Plaintiffs waived any rights to privacy through Tracy's actions in sending written communications to Ahlan, on a phone and through a business which Agustin owns.

Moreover, once Tracy put her claims against Tucker and MSU's entire 1200-page investigative file (including selective communications with Ahlan) in USA Today's hands, she relinquished beyond doubt any privacy rights on Plaintiffs' part. Namely, Tracy's decision to place the RVSM Complaint and MSU's investigation into the news means that the Letter (including the disclosure of heavily redacted communications between Tracy and Ahlan) is entitled to First Amendment

protection as it relates to a "legitimate concern to the public." *Fry v. Ionia Sentinel-Standard*, 101 Mich. App. 725, 729-31, 300 N.W.2d 687, 690 (1980). "Information of a legitimate concern to the public includes matters regarded as 'news.'" *Id.* ("news" means matters of "popular appeal"). Thus, the First Amendment is a "defense in state tort suits" aimed at punishing defendants for speech that involves "the subject of legitimate news interests." *See Higgins v. Ky. Sports Radio, LLC*, 951 F.3d 728, 736 (6th Cir. 2020) (internal citations omitted).

*Higgins* is instructive on this point. There, the plaintiff was a referee in a hotly contested college basketball game who made a controversial, potentially game-deciding call. *Id.* He also owned a roofing business. *Id.* at 733-34. Defendants, Kentucky Sports Radio and its commentators, publicized highly critical information about the referee, drawing attention to his roofing business, which Kentucky basketball fans proceeded to harass with negative reviews. *Id.* The Sixth Circuit found that the negative commentary, even about the roofing business, was protected free speech, because the referee's participation in the high-profile game was a legitimate matter of public concern. *Id.* at 734-35. Noting that the referee had previously used his "visibility and status as a referee to secure [roofing] business," the Sixth Circuit Court of Appeals declined to allow him to "seek damages from pundits who called attention to the existence of [the] business that he promoted with his status as a referee before that became a liability." *Id.* at 736.

Here, by analogy, Tracy put her communications with Ahlan, and indeed the wider matter of her complaint against Tucker, into mainstream media via releasing MSU's entire investigative file to USA Today.  ***She*** made it news.  The Letter's responsive discussion of these matters was, obviously, newsworthy, and a matter of legitimate public concern.  "Those who step into the public limelight, even temporarily, must face the hazard that sometimes comes with it." *Id.* at 740.  Tracy's own actions triggered Defendants' First Amendment right to release communications between Tracy and Ahlan relevant to the RVSM Complaint and investigation, which is, in fact, all that the Letter did.

### D. Plaintiffs Cannot Succeed on the Merits of Their Frivolous Claims.

Even if the Court does not reject Plaintiffs' Motion because it relies on a house of lies at its "foundation," Plaintiffs cannot prevail on the merits.  This too compels denial of any injunctive relief. *Brunner*, 543 F.3d at 362.  Plaintiffs displayed their poor chances of success once already in amending their complaint, and now seeking to amend it again, to remove claims that she told the court justified the TRO.  Specifically, after securing a TRO based in part on the false claim that Defendants released medical records protected by state law, Plaintiffs amended their complaint

to drop that cause of action as well as a wildly improper whistleblower protection claim.[37] Yet, as detailed below, the remaining and new claims fare no better.

1. **Count II Fails: Defendants Did Not Violate Michigan's So-Called Eavesdropping Statute, Which Is Inapplicable as a Matter of Law.**

Although Plaintiffs' Complaint raises a kitchen sink of counts, their Brief only argues that they will be successful on the merits as to one: MCL § 750.539 *et seq.* (the "Eavesdropping Statute").[38] In other words, the only alleged legal footing relied upon for Plaintiffs' injunction is the Eavesdropping Statute. But the Eavesdropping Statute does not apply as a matter of law to this case, because ***it does not apply to written communications***.

To be clear, the Eavesdropping Statute "was meant to prohibit eavesdropping in the traditional sense of recording or secretly listening to audible conversation." *Bailey v. Bailey*, No. 07-11672, 2008 U.S. Dist. LEXIS 8565, at *21 (E.D. Mich. Feb. 6, 2008) (holding that a husband's use of a keystroke logger to obtain passwords and then read wife's emails with others did not implicate MCL § 750.539). Plaintiffs' argument otherwise defies logic. According to Plaintiffs, if two

---

[37] The whistleblower claim would have required Plaintiffs to have been employed by Defendants. It was an absurd attempt to grab a headline and had no Rule 11 basis. Yet it is still referenced in passing in Plaintiffs' brief. Pl. Br. 5. So too is Plaintiffs' abandoned claim regarding Michigan's Mental Health Code still mentioned in their amended complaint. Am. Compl. ¶ 79. This slipshod drafting highlights Plaintiffs' baseless rush to the courthouse.

[38] *See* Pl. Br. 5.

individuals write notes back and forth, no one else can later read or share the notes without facing *criminal* liability.  That's absurd.  All the more so here, given that the relevant written communications directly relate to Tracy's case, she shared part of those communications, they were made through a business partly owned by and they are admissions against interest admissible under the rules of evidence (Fed. R. Evid. 804(b)(3)) and discoverable in litigation (Fed. R. Civ. P. 26(b)(1)).  That Plaintiffs have no legitimate evidentiary or procedural avenue to conceal Tracy's relevant communications with Ahlan underscores that they are improperly citing the Eavesdropping Statute to conceal "bad facts."

*Dickerson v. Raphael* does nothing to help Plaintiffs' cause.  They pretend *Dickerson* simply held that any "later rebroadcast" of a private conversation violates the Eavesdropping Statute.[39]  Not so.  The Eavesdropping Statute requires that a "device" be used to eavesdrop without the consent of conversation participants, and prohibits divulgence of recordings obtained in such manner (*i.e.*, with a device and without consent).  MCL §§ 750.539c, 750.539d.  Such was the scheme in *Dickerson*: the eavesdropper wore a "transmitting device" that simultaneously and "surreptitiously" broadcast a private, oral conversation to third-party defendants, who later re-broadcast that contemporaneously recorded conversation on television.  222 Mich. App. 185, 191 (1997) (emphasis added) (addressing "the narrow issue"

---

[39] Pl. Br. 5.

of whether the Eavesdropping Statute "prohibit[s] third parties from recording covertly, ***while it occurs***, a private conversation in which they are not participants and then rebroadcasting that conversation"). With these facts, the *Dickerson* Court rightly deemed MCL § 750.539c and MCL § 750.539d applicable.

But this case is nothing like *Dickerson*.  Plaintiffs allege no "device" whatsoever.  Plaintiffs allege no surreptitious and simultaneous recording of some oral conversation.  Nor could they because they are written communications.  Ahlan simply shared her password with Agustin, who owns the Phone, which contains written communications.[40]  No device, no audible conversation, no eavesdropping claim.  Plaintiffs' Count II, and their sole reliance on the Eavesdropping Statute to support a claim for injunctive relief, fail as a matter of law.

> ### 2. Count III Fails: Defendants Have Not Violated the Computer Fraud and Abuse Act ("CFAA"), Which Is Also Inapplicable Here.

Count III alleges a violation of the CFAA; specifically, 18 USCS § 1030(a)(2), which prohibits "'intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any

---

[40] Even if the Eavesdropping Statute applied to written communications (it does not), Plaintiffs' eavesdropping would fail.  That's because Michigan is a so-called one-party consent state. *See Sullivan v. Gray*, 117 Mich. App. 476, 482 (1982).  To the extent that Ahlan "recorded" her texts with Tracy, Ahlan was at liberty to share those communications with Agustin.  Tracy cannot control Ahlan's disclosure to Agustin, *id.*, and indeed has no expectation of privacy in the messages she sent Ahlan. *Infra* p. 20.

protected computer.'"  Plaintiffs' CFAA claim is a non-starter, because liability under the CFAA turns on "proof of 'unlawful information access,' as opposed to 'downstream information misuse.'"  *Welter v. Med. Prof'l Mut. Ins. Co.*, 2023 U.S. Dist. LEXIS 70304, at *14 (D. Mass. Feb. 23, 2023) (citing *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021)).  The Supreme Court frames this as a "gates-up-or-down inquiry[:] one either can or cannot access a computer system, and one either can or cannot access certain areas within the system."  *Van Buren*, 141 S. Ct. 1648, 1650 (2021).

Here, the gates were up.  Agustin's rightful ownership of the business in a contractual relationship with Plaintiffs, as well as the Phone, and permission to access the contents of the Phone through the password to the Phone—which granted him access to the entirety of its contents—moots any argument that he or others[41] at his direction exceeded authorized access.  Put otherwise, Plaintiffs cannot erect non-existent barriers to certain information on the Phone that was in fact unrestricted upon entry of the password.  *See, e.g.*, *Welter*, 2023 U.S. Dist. LEXIS 70304, at *19 (complaint failed to state CFAA claim because it did 'not allege that [defendant]

---

[41] Plaintiffs oddly fail to identify *who* allegedly accessed or exceeded authorized access to the Phone in their Complaint. No one did.

broke into any part of [the] computer system" to access HIPAA information; rather, he "simply used his password").

That Agustin owns the Phone further refutes Plaintiffs' CFAA claim. "The CFAA . . . does not concern itself with authorization by a person impacted by the action.  Instead, it is focused on whether a computer user's 'access' to a computer system is 'authorized' ***by the owner*** or administrator of that computer system." *Ross v. Yager*, Civil Action No. 11-cv-01877-MSK-MEH, 2012 U.S. Dist. LEXIS 158888, at *6-7 (D. Colo. Nov. 6, 2012) (emphasis added).  As owner of the Phone, Agustin cannot exceed his self-determined authorized access to it.

Finally, independent of these bars to recovery, Plaintiffs failed to allege damages under the CFAA.  They generically claim that they "have suffered damage or loss, and will further suffer damage and loss, by the threatened release of the records on [Ahlan's] phone or other sources," which losses will somehow "exceed $5,000,0000 based on harm to Plaintiffs, including but not limited to harm to their reputation, mental health, safety, and business interests."[42]  That does not cut it under the CFAA.  *Van Buren* foreclosed any notion that Defendants' "use" of the records could sustain a CFAA claim; rather, cognizable "losses" relate to the cost of responding to unauthorized access, conducting a damage assessment, restoring data, and the like. *See Abu v. Dickson*, No. 20-10747, 2023 U.S. Dist. LEXIS 91828, at

---

[42] Am. Compl. ¶¶ 51, 52.

*11 (E.D. Mich. May 25, 2023).  Plaintiffs allege no such losses here, which dooms the claim as a matter of law.  *See Courser v. Allard*, 969 F.3d 604, 619 (6th Cir. 2020) (affirming dismissal of CFAA claim based on failure to allege "losses" covered by CFAA, and noting that CFAA claim was "especially dubious" because the device at issue did not even belong to the plaintiff).

Bottom line:  the CFAA is designed to combat hacking—not to prevent Defendants from accessing the Phone (owned by Agustin) using the password Ahlan shared with him.

### 3.   Count IV Fails: Michigan's Version of the CFAA Does Not Provide a Private Cause of Action.

Plaintiffs next claim a violation of Michigan's "Fraudulent Access to Computers, Computer Systems, and Computer Networks Act, MCL 752.791 *et seq*." Plaintiffs shockingly *amended* their Complaint to *add* this legally deficient claim. To be sure, there is no factual basis for it.  But the Court need not consider this claim as a matter of law: MCL § 752.791 *et seq.* does not create a private cause of action. *See Allard*, 969 F.3d at 619 (affirming dismissal of claim under MCL 752.791 at 12(b)(6) stage because it does not create a private cause of action).

### 4.   Count V Fails: Defendants Cannot Convert What They Own.

Plaintiffs next raise a claim under MCL § 600.2919a, which sets forth the requirements for a claim of statutory conversion (the "Conversion Statute").  In

relevant part, the Conversation Statute prohibits "[b]uying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property with knowledge that such property was stolen, embezzled, or converted." *Id.* An action for conversion cannot lie if a "defendant's right to possession [is] greater than that of plaintiff's[.]" *Rohe Scientific Corp. v. Nat. Bank of Detroit*, 350 N.W.2d 280, 282 (Mich. Ct. App. 1984). That is true here. Agustin owns the Phone. By contrast, Plaintiffs have not plausibly alleged (nor could they) an ownership interest in the Phone. With no legally cognizable interest in the Phone, Plaintiffs' conversion claim fails as a matter of law.

To the extent Plaintiffs claim a property interest in the *content* of Tracy's written communications on the Phone, they are wrong again as a matter of law. BTLLC and STE do not "own" Tracy's written communications with Ahlan. As detailed above, Tracy has no legitimate expectation to privacy over her messages. *Supra* p. 20. It follows that Plaintiffs do not "own" any "records" on the Phone. In sum, Defendants have not stolen and cannot steal the Phone or its contents from Plaintiffs; Plaintiffs do not own such things.

### 5. Count VI Fails: Defendants Have Not Tortiously Interfered with Business Relations.

The allegations in Count VI fail to establish the elements of tortious interference. While the Complaint is unclear whether Count VI alleges tortious interference with a business relationship or intentional interference with a contract

(separate torts under Michigan law), either theory is unsustainable.  *See Feaheny v. Caldwell*, 175 Mich. App. 291, 301, 437 N.W.2d 358, 362 (1989).  As to tortious interference with a contract, Plaintiffs fail at the gate:  they do not and cannot point to a contract.  Rather, Plaintiffs rely on an implied employment-at-will relationship between either BTLLC or STE and Ahlan[43] (Am. Compl. ¶ 64), which cannot supply the basis for tortious interference with contract as a matter of law.  *Feaheny*, 175 Mich. App. at 303.

As to tortious interference with a business relationship, Plaintiffs again fail on the first element: there is no "valid business relationship or expectancy" alleged here.  *See BPS Clinical Laboratories v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 689–99 (1996).  Plaintiffs allege such relationship and expectancy existed with Ahlan, but, sadly, Ahlan is dead.  There is thus no cognizable relationship with which Defendants interfered.  And while Plaintiffs also vaguely claim interference with their "business dealings," this conclusory reference is indecipherable.  Regardless, to the extent Defendants' release of written communications between Tracy and Ahlan "tarnished" Plaintiffs' reputation (Am. Compl. ¶ 69), that stain is not attributable to any wrongdoing on Defendants' part; it's the product of Tracy first

---

[43] Ahlan was not the part-time employee; it was an LLC owned by Agustin that was employed by Tracy on a part-time basis only.

lying to the investigator and then placing her credibility before the national media by going public with USA Today.

### 6. Count VII Fails: Plaintiffs' Waived Any Invasion of Privacy Claim, Which Is Also Barred by the First Amendment.

Plaintiffs allege invasion of privacy based upon theories of "intrusion upon seclusion" and "public disclosure of embarrassing private facts about the plaintiff." (Am. Compl. ¶¶ 72-74.)  Plaintiffs waived these invasion of privacy claims by virtue of Tracy's waiver, detailed above, of any privacy with respect to her communications with Ahlan relevant to Tracy's case against Tucker.  *See Lewis v. LeGrow*, 258 Mich. App. 175, 194-95, 670 N.W.2d 675, 688 (2003) (invasion of privacy claims may be waived, which entitles invasion to extent legitimately necessary to deal with matter which has brought about the waiver);  *see also Earp v. Detroit*, 16 Mich. App. 271, 280, 167 N.W.2d 841, 847 (1969) (plaintiff, by discussing the allegedly private matter with a coworker, "in effect . . . helped to lift the curtain of privacy").   Moreover, as also detailed above, Defendants' First Amendment rights prevail as a matter of law over this tort claim. *Higgins*, 951 F.3d 728 at 736 (affirming dismissal of invasion of privacy claims at 12(b)(6) stage based on First Amendment protection of defendants' speech regarding matters of public concern).

### 7. Count VIII Fails: Plaintiffs' Civil Conspiracy Claim Relies on Her Other Futile Allegations.

Plaintiffs' civil conspiracy claim fails because her claims for tortious interference and invasion of privacy fail. "[A] claim for civil conspiracy may not exist in the air; rather it is necessary to prove a separate, actionable tort." *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003) (plaintiff's failure to state a prima facie case of tortious interference means his conspiracy claim also failed).

### E. Other Factors Weigh Against Plaintiffs' Desired Injunctive Relief Here.

### 1. Plaintiffs Will Not Suffer Irreparable Injury or Harm If the Injunction Is Not Granted.

Plaintiffs will suffer no "irreparable injury" if the Court denies the Motion. Plaintiff's "irreparable injury" argument relies on the pretense that Defendants "seek to further publish private conversations to the public in a malicious and contemptable revenge attack on entities that provided evidence to a public body and innocent individuals who were simply caught up in Defendants' malevolent attacks." Pl. Br. 4. As detailed above, this is an unsubstantiated, hyperbolic red herring. In truth, Defendants did nothing but call out Tracy's inconsistencies and incredibility as demonstrated by some of her other written communications with Ahlan. This impeachment effort related exclusively to Tracy's allegations and had (and has) nothing to do with "innocent individuals There is no necessity of an injunction to

preserve the status quo as Defendants have not, and will not, release any information about sexual assault victims (to the extent it exists) or any other legally protectible information. To the extent that Tracy has a cause of action based on the disclosure of "embarrassing" information about her (she does not), money damages are an adequate remedy.

### 2.  The Balance of Harms Favors Denying Injunctive Relief.

Relatedly, Plaintiffs will not experience any harm in the absence of an injunction, much less "harm" that outweighs that to Defendants if an injunction is issued.  On the one hand, absent an injunction, Plaintiffs face the reality that after Tracy made some of her communications with Ahlan national news, she must deal with Defendants' targeted release of her additional related communications with Ahlan—none of which implicate protected business or health information.  On the other hand, with Plaintiffs' requested injunction, Tucker faces the reality that he cannot use information that would be admissible and discoverable in any legitimate forum to defend himself in the court of public opinion, before MSU, and against Tracy.  He would literally be unable to fairly prosecute or defend claims in court.

### 3.  The Balance of Harms Favors Denying Injunctive Relief.

For this reason too, the public interest dictates dissolution of the TRO and denial of an injunction.  Granting the injunction silences the truth, while denying the injunction frees it.

## IV.   __CONCLUSION__

Plaintiffs invented the specter of confidential business records, identification of assault victims, and medical and mental health records as an imminent danger requiring state court intervention on an emergency basis without notice or hearing. Plaintiffs have amended their complaint and abandoned their claims creating exigent circumstances, but their remaining claims are equally baseless.  Now, Plaintiffs seek to abandon another claim, the CFAA, to try again to manipulate the outcome. There never has been any valid basis for injunctive relief so this Court should dissolve the *ex parte* TRO and deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted: October 17, 2023

/s/John F. Birmingham, Jr.
John F. Birmingham, Jr. (P47150)
Jennifer L. Belveal (P54740)
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100
jbirmingham@foley.com
jbelveal@foley.com

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.2(b)(2), and according to the word count functionality in Microsoft Word, this Brief contains 8,332 words, including the words in this certificate of compliance.